AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>**WYATT PASEK,<br>DUC CAO,<br>ISAIAH SUAREZ** | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br><br>**SA18 - 160M** |

| Complaint for violation of Title 21 U.S.C. 846 | | |
|---|---|---|
| NAME OF MAGISTRATE JUDGE<br>HONORABLE Karen E. Scott | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Santa Ana, California |
| DATE OF OFFENSE<br>April 4, 2018 | PLACE OF OFFENSE<br>Orange County | ADDRESS OF ACCUSED (IF KNOWN) |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

From on or about May 1, 2017, in Orange County, within the Central District of California, defendants WYATT PASEK, DUC CAO, and ISAIAH SUAREZ conspired to distribute fentanyl, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 846 .

FILED
CLERK, U.S. DISTRICT COURT

APR - 4 2018

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br><br>**LINDSEY M. BELLOMY**    /s/ |
|---|---|
| | OFFICIAL TITLE<br>Special Agent, Drug Enforcement Administration |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br><br>KAREN E. SCOTT | DATE  4/4/18 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA BSagel:sks     REC: Detention

## AFFIDAVIT

I, Lindsey Bellomy, being duly sworn, declare and state as follows:

### I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the United States Department of Justice, Drug Enforcement Administration ("DEA") and have been so employed since December 2010.  I am currently assigned to the Los Angeles Field Division, Orange County Resident Office ("OCRO").  At OCRO, I am assigned to the Tactical Diversion Squad.  During my tenure with DEA, I have received comprehensive, formalized instruction on such topics as drug identification, money laundering techniques, patterns of drug trafficking, complex conspiracies, the exploitation of narcotics traffickers' telecommunications devices, criminal law, surveillance, and other investigative techniques.  I have participated in numerous investigations into the unlawful importation, manufacture, and distribution of controlled substances, the laundering of narcotics proceeds, and conspiracies associated with narcotics offenses.  In conducting these investigations, I have utilized a variety of investigative techniques and resources, including surveillance, confidential source debriefings, telephone toll analysis, and wire communications analysis.

2.    Based on my training and experience, I am also familiar with drug traffickers' use of counter-surveillance techniques to avoid detection by law enforcement.   I know that drug traffickers often communicate with their drug-trafficking associates via cell phones and other digital devices.   During drug-related communications, traffickers often use coded or cryptic language to disguise the drug-related nature of their conversations.

## II. PURPOSE OF AFFIDAVIT

3.    This affidavit is made in support of a criminal complaint against Wyatt PASEK ("PASEK"), Duc CAO ("CAO"), and Isaiah SUAREZ ("SUAREZ") for a violation of Title 21, United States Code, Section 846 (Conspiracy to Distribute Controlled Substances – fentanyl and fentanyl analogues).

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.   This affidavit is intended to show merely that there is sufficient probable cause for the requested criminal complaint and does not purport to set forth all of my knowledge of or investigation into this matter.   Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. COURT ORDERS OBTAINED DURING THE INVESTIGATION

5.    On February 1, 2018, the Honorable John D. Early, United States Magistrate Judge, issued a warrant authorizing the

disclosure of cell-site information and GPS locational data for
PASEK's cellular telephone.

6.    On February 8, 2018, the Honorable Jay C. Gandhi,
United States Magistrate Judge, issued a warrant authorizing the
installation of a tracking device for PASEK's 2012 Ferrari,
PASEK's Ferrari.

7.    On February 23, 2018, the Honorable Karen E. Scott,
United States Magistrate Judge, issued a warrant authorizing the
installation of a tracking device for CAO's 2013 Mercedes-Benz,
CAO's Mercedes-Benz. Investigators were unable to locate CAO's
vehicle within the timeframe per the warrant and, therefore,
never installed the device at that time.  Since then,
investigators were able to locate CAO's Mercedes-Benz, and
installed a tracking device (see ¶11).

8.    On March 2, 2018, the Honorable John D. Early, United
States Magistrate Judge, issued a warrant authorizing the
installation of a tracking device for PASEK's 2015 Toyota
4Runner, PASEK's 4Runner.

9.    On March 8, 2018, the Honorable Jay C. Gandhi, United
States Magistrate Judge, issued a warrant authorizing the search
of seven United States Postal Service Priority Mail parcels.

10.    On March 21, 2018, the Honorable John D. Early, United
States Magistrate Judge, issued another warrant authorizing the
disclosure of cell-site information and GPS locational data for
PASEK's cellular telephone.

11.    March 21, 2018, the Honorable John D. Early, United
States Magistrate Judge, issued a warrant authorizing the

installation of a tracking device for CAO's 2013 Mercedes-Benz,
CAO's Mercedes-Benz.

12.  On March 28, 2018, the Honorable Douglas F. McCormick,
United States Magistrate Judge, issued a warrant authorizing the
installation of a pen register for PASEK's home IP address.

13.  On March 29, 2018, the Honorable Douglas F. McCormick,
United States Magistrate Judge, issued search warrants
authorizing the search of: (1) 9 MacArthur Place, Unit 2502,
Santa Ana, California 92707 (PASEK's residence); (2) 705 E.
Balboa Boulevard, Unit B, Newport Beach, California 92661
(SUAREZ's residence); (3) 1817 Bedford Lane, Unit A, Newport
Beach, California 92660 (PASEK's mother's residence); (4) 3099
W. Chapman Avenue, Unit 402, Orange, California 92868 (CAO's
residence); (5) PASEK's black 2012 Ferrari California, bearing
paper license plate, "Euro Car," with Vehicle Identification
Number ("VIN") ZFF65LJA1C0183256, registered to Wyatt PASEK at
1817 Bedford Lane, Apartment A, Newport Beach, California 92660;
(6) PASEK's 2015 Toyota 4Runner, grey in color, bearing
California license plate 7LRG139, with VIN JTEZU5JRXF5100524,
registered to Wyatt PASEK at 1817 Bedford Lane, Apt A, Newport
Beach, CA 92660; and (7) CAO's 2013 white Mercedes-Benz, white
in color, bearing California license plate 7ALL647.

IV. **STATEMENT OF PROBABLE CAUSE**

A.    **SUMMARY OF THE INVESTIGATION**

14.  Evidence gathered in this investigation indicates that
PASEK, CAO, SUAREZ and others are involved in a conspiracy to
manufacture, possess, and distribute fentanyl and cyclopropyl

4

fentanyl – an analogue of fentanyl, which is a schedule II controlled substance, which is used to make counterfeit opioids that are in high demand.  The evidence establishes that PASEK, CAO, and SUAREZ manufacture the fentanyl and/or its analogue at SUAREZ's residence, 705 E. Balboa Boulevard, Unit B, Newport Beach, California 92661, and then distribute the drugs through the United States Postal Service.  The evidence further establishes that PASEK, CAO, and SAUREZ use a marketplace on the dark web to facilitate their conspiracy to distribute fentanyl and its analogues.

> B.  **SUMMARY OF SURVEILLANCE AND ENFORCEMENT ACTIVITY**

15.  In or around May 2017, agents with the Federal Bureau of Investigations ("FBI") informed me that a confidential source ("CS-1")[1] had advised them of recent narcotics trafficking activities by two individuals.  Per CS-1, these two individuals own and operate businesses in Costa Mesa and Newport Beach, California, and they sell narcotics, including counterfeit pharmaceutical pills, from their businesses.  CS-1 further reported that, in or around September 2017, these two drug distributors contacted CS-1 and stated they had narcotics to give him/her as a sample.

---

[1] CS-1 has provided information to law enforcement since approximately early 2017.  This information has been corroborated throughout investigation by myself and others and therefore confirmed to be reliable.  CS-1 has not provided information deemed by agents to be false.  CS-1's criminal history includes convictions for the following: burglary (1993 and 2000); forgery (1998 and 2000); receiving stolen property (2000); escape jail (1993); and reckless driving (2000).  CS-1 is currently working with law enforcement for sentencing consideration in connection with his federal money laundering guilty plea, for which he was arrested in or around 2015.

16.   On or about September 11, 2017, at the direction of law enforcement, CS-1 met with one of these drug distributors at the distributor's business in Costa Mesa, California.   This meeting was recorded.   According to the post-operation debriefing of CS-1 (which agents determined was consistent with the video recording), the distributor gave CS-1 a plastic bag of blue pills each stamped, "A215."   In the presence of CS-1, the distributor called an unidentified male – at that time referred to as "Wyatt" and later identified as PASEK – to confirm the quality and contents of the blue pills.   The distributor relayed to CS-1 that PASEK represented that the pills were "home-pressed" and contained fentanyl, and that PASEK is a 21-23 year old, white male from Newport Beach, California.   The distributor advised that PASEK was currently in possession of 100,000 pills, and advised CS-1 that the prices were $4 per pill for at least 10,000 pills, or $5 per pill for less than 10,000; the minimum order was 5,000 pills.   After this discussion CS-1 received the aforementioned plastic bag, which contained approximately seven round, blue, A-215 pills that purportedly came from PASEK.   CS-1 provided these pills to FBI agents who, in turn, submitted the pills to the DEA Southwest Laboratory in Vista, California.   Subsequent lab testing determined that the blue A-215 pills contained cyclopropyl fentanyl.

17.   Based on my training and experience, I know Fentanyl is a schedule II controlled substance.   The statute governing analogues of controlled substances (21 U.S.C. § 813) provides that a "controlled substance analogue shall, to the extent

intended for human consumption, be treated, for the purposes of any Federal law as a controlled substance." Based on my discussions with, and review of reports by, DEA experts and chemists, the seized cyclopropyl fentanyl is a chemical analogue of fentanyl, and is therefore a controlled substance. Furthermore, on or about November 21, 2017, the DEA proposed a notice of intent to add cyclopropyl fentanyl to Schedule I under the Controlled Substances Act.  Furthermore, I know that "A215" is the stamp used on legitimate pharmaceutical grade Oxycodone 30 mg pills.  I also know from my training and experience that it is becoming a common trend for illicit narcotics manufacturers to make counterfeit pharmaceutical pills that resemble legitimate pharmaceutical pills, especially opioids.  I also know that illicit narcotics manufacturers are using fentanyl, fentanyl analogues -- such as cyclopropyl fentanyl, and other opioids to make counterfeit pharmaceutical pills.

18.  Costa Mesa Police Department ("CMPD") Special Investigations Unit ("SIU") Detective Jeremy Hermes informed me of the following surveillance that took place on January 30, 2018:

a.  CMPD SIU established surveillance at 9 MacArthur Place in Santa Ana, California ("9 MacArthur Place"), which was identified as a location potentially involved in PASEK's narcotics-related activities.  At approximately 3:25 p.m., Detective Hermes observed a black Lamborghini turn onto MacArthur Place.  He recognized the driver of the Lamborghini to be PASEK from a California DMV

photo.   PASEK drove into the guest underground parking structure at 9 MacArthur.   Detective Hermes followed PASEK into the parking structure and saw him and an Asian male – later identified via a California DMV picture as CAO – exit the Lamborghini.   PASEK and CAO went into the apartment building from the underground parking structure.

   b.   Several minutes later, CMPD Detective Fricke saw PASEK and CAO reenter the parking structure and depart the parking structure in the Lamborghini.

   c.   CMPD Sergeant Selinske conducted a traffic stop on that vehicle and confirmed the driver to be PASEK. During the stop, Detective Fricke called PASEK's cellular telephone.   (That telephone number had been previously identified through a toll analysis of the telephone of the individual who provided CS-1 the blue, A-215 pills on September 11, 2017, which showed that his call to the supplier of the blue, A-215 pills, "Wyatt," in CS-1's presence had, in fact, been made to PASEK.)   Detective Hermes observed PASEK answer his cell phone, holding it to his ear for approximately twenty seconds.

   d.   After the traffic stop, CMPD detectives maintained surveillance of PASEK.   As he was driving, PASEK made several unnecessary detours, which the CMPD Detectives knew from their training and experience to be a common counter-surveillance technique used by drug traffickers to avoid detection by law enforcement.

19.   In February 2018, I received information back from a subpoena that was served on Essex Skyline Apartments, the property managers of 9 MacArthur.  Among the documents was the lease agreement for PASEK that revealed PASEK had signed a lease agreement for Unit 2502 at 9 MacArthur -- on the 25th floor of the 25 story apartment building -- to commence on October 10, 2017, for approximately 1 year and 1 month.  Per the lease agreement, PASEK's base rent for 9 MacArthur is $5,749 per month.  Also within the documents were three earnings statements for the periods from 09/16/2017 to 09/30/2017, 09/01/2017 to 9/15/2017, and 08/16/2017 to 08/31/2017 that PASEK provided to Essex Skyline Apartments purportedly prepared by "ADP."  These statements claim that PASEK's gross pay for each two week period is $9,250.00 with a net pay of $5,253.00.  The earning statement ending 09/30/2017 stated that PASEK had earned $166,500.00 year to date, and per PASEK's lease application, PASEK claims to earn $222,000.00 a year.

20.   I learned from United States Marshals Service SA James Sangirardi that ADP stated it did not have anything on file matching the earnings statements PASEK provided to his apartment building.  Having spoken with SA Sangirardi and other agents involved in this investigation, I do not believe these are legitimate earnings statements.  Furthermore, after conducting multiple surveillances, having pinged PASEK's phone, and placing car trackers on PASEK's vehicles, law enforcement has not observed PASEK going to a legitimate place of work during the day or at night.  Therefore, I believe PASEK is not legitimately

employed and provided false information to his residence to conceal his true source of income.

21. Detective Hermes informed me of the following surveillance that took place on February 6, 2018:

    a.    At approximately 2:30 p.m., CMPD SIU established surveillance of PASEK in the parking lot behind 600 E. Oceanfront, Newport Beach, CA, based on the GPS location of PASEK's telephone. Detective Hermes observed PASEK sitting in the driver seat of PASEK's Ferrari. Several minutes later, Detective Hermes observed an Asian male walking on Washington Street towards PASEK in PASEK's Ferrari. Detective Hermes recognized the Asian male as the same individual (that is, CAO) who was with PASEK in the black Lamborghini on January 30, 2018.

    b.    Detective Hermes observed CAO enter the passenger side of PASEK's Ferrari. Moments later, Detective Hermes observed PASEK and CAO drive away and travel northbound on Balboa Boulevard. Detective Hermes temporarily lost sight of PASEK, but soon after reestablished contact with the automobile in front of 1817 Bedford Lane, Newport Beach, California ("Bedford Lane"). At that time, Detective Hermes observed that PASEK's Ferrari was unoccupied.

    c.    Approximately ten minutes later, Detective Hermes observed PASEK and CAO walking from the area of Bedford Lane towards PASEK's Ferrari. Detective Hermes observed PASEK carrying a black backpack, placing the

backpack inside of PASEK's Ferrari, and then entering the driver's seat.  CAO entered the passenger seat of PASEK's Ferrari and PASEK and CAO then drove away and traveled south towards Balboa Boulevard.

d.    A few minutes later, CMPD Detective Sergeant McKinley observed PASEK and CAO arrive in a parking lot located at 600 E. Oceanfront, Newport Beach, California. Detective Sergeant McKinley observed PASEK drive through the parking lot and onto Washington Street.  Detective Sergeant McKinley maintained observation and saw CAO exit PASEK's Ferrari.  Detective Sergeant McKinley saw that CAO was holding a brown paper bag as he exited the vehicle and walked south into the alley behind 705 E. Balboa Boulevard. CAO then entered the driver's seat of a parked white 2013 Mercedes Benz sedan, which was parked in a parking stall under a garage port behind 705 E. Balboa Boulevard.  A records revealed a traffic citation associated with that Mercedes Benz sedan, with the driver at the time of the citation being Duc CAO.

22.   Detective Hermes informed me of the following surveillance that took place on February 11, 2018:

a.    At approximately 10:54 a.m., Detective Hermes was monitoring PASEK's Ferrari via a GPS transmitter.  Detective Hermes observed PASEK's Ferrari depart 9 MacArthur Place and drive into Newport Beach. Detective Hermes continued to monitor PASEK's Ferrari via GPS while driving towards Bedford Lane as Detective Hermes

11

believed PASEK was driving there.  When Detective Hermes arrived, he observed PASEK's Ferrari parked directly behind 1817 Bedford Lane, Unit A, Newport Beach, California 92660.

b.   The GPS transmitter indicated that PASEK's Ferrari was stopped at Bedford Lane for about 30 minutes, then continued to travel southbound.  Based on the direction of travel, Detective Hermes suspected PASEK was driving to the 705 E. Balboa Boulevard.  Detective Hermes suspected this because he had observed PASEK drive from 705 E. Balboa Boulevard to Bedford Lane and then back to 705 E. Balboa Boulevard with CAO in the past.

c.   CMPD Detectives then established surveillance at 705 E. Balboa Boulevard, Unit B, Newport Beach, California 92661.  Detective Hermes observed both PASEK's Ferrari and CAO's Mercedes-Benz parked directly behind the above location.  Detective Hermes suspected PASEK and CAO were meeting at Unit B.

d.   After several minutes of watching Unit B, Detective Hermes observed the door open and PASEK exit with an unidentified white female quickly closing the door before walking away.  Detective Hermes observed PASEK and the female walk towards PASEK's Ferrari and a few minutes later drive away.

e.   Approximately 50 minutes after PASEK left the location, Detective Hermes saw the door open again and observed CAO exit Unit B for about 5 minutes and was

looking around.  After about 5 minutes, CAO reentered Unit B and closed the door behind him.

      f.   During this surveillance, Detective Hermes continued to monitor PASEK via GPS and saw it was back at 9 MacArthur.  At that time, Detective Hermes ended physical surveillance of Unit B, but continued monitoring the GPS on PASEK and noticed PASEK was only at 705 E. Balboa Boulevard, Unit B, Newport Beach, California for about 10-15 minutes and at Bedford Lane for about 30 minutes.

      g.   I learned that Isaiah SUAREZ is the tenant on the lease for 705 E. Balboa Boulevard, Unit B, Newport Beach, California from information obtained from the property management company for the address.

23.  On or about February 14, 2018, Detective Hermes informed me that another Confidential Source ("CS-2")[2] informed CMPD Detective Saar on November 3, 2017, about an illicit pill pressing operation being conducted on Balboa Boulevard in Newport Beach.  CS-2 explained how the male running this

---

    [2] CS-2 provided information to law enforcement starting in approximately late 2017.  This information has been corroborated throughout the investigation by myself and others and therefore confirmed to be reliable.  CS-2 has not provided information deemed by agents to be false.  CS-2's criminal convictions include the following: possession of controlled substances (2013); burglary and larceny (1996); possessing marijuana (1997); felony by prisoner (1998); and larceny, possession of burglary tools, contributing to the delinquency of a minor (2001).  CS-2 was providing law enforcement with credible information after being arrested in November 2017 for possession of and sales of narcotics; however, CS-2 has recently been arrested again and law enforcement is no longer working with him/her at this time.  CS-2 has never been otherwise charged with or convicted of any offense involving lying or the giving of false information.

operation was known to drive a black Ferrari type of vehicle. CS-2 also explained how he/she knew of another male that was assisting in this pill pressing operation.  CS-2 did not know the names of either of the males, but he/she did provide that the person assisting with the pill pressing operation goes by the moniker of "Slabs" with phone number 949-xxx-4339. Detective Saar conducted a records check of the above phone number and moniker and subsequently identified SUAREZ as the assistant in this pill pressing operation.

24.  CS-2 also stated that he/she was told that the person running the pill distribution operation uses the dark web to order the active ingredients, fentanyl and fentanyl analogues, and that he also has a storefront on the dark web where he sells his counterfeit pills.

25.  Having spoken with other agents, who have worked drug distribution investigations involving the dark web, I know that the use of crypto-currency, namely Bitcoin, is often times used to make purchases on the dark web, because those involved in illegal activity believe that their transactions cannot be tracked or traced back to them, or at least it is much more difficult to track or trace them.

26.  I was informed by Detective Hermes of the following surveillance that took place on February 20, 2018:

     a.  At approximately 12:30 p.m., CMPD conducted surveillance at 705 E. Balboa Boulevard, Unit B.  Detective Hermes observed PASEK and CAO walk up to the door of Unit B and enter after PASEK used keys to gain access.  About one

minute later, PASEK exited the door, closed it behind him, and walked towards the open garage. Detective Sergeant McKinley drove by the open garage and saw CAO's Mercedes-Benz parked in the garage. About one minute later, CAO walked back to the door of Unit B, entered after using keys to gain access, and closed the door behind him.

b.   At about 12:40 p.m., PASEK, CAO, and an unidentified male, later identified as SAUREZ, exited 705 E. Balboa Boulevard, Unit B, Newport Beach, California 92661 and walked towards the garage. Detective Fricke observed CAO entered the driver's side of CAO's Mercedes-Benz, PASEK entered the front passenger side, SAUREZ entered the rear passenger side of the car, and then they departed in CAO's car.

c.   After they departed, Detective Fricke noticed there were approximately 6 trash cans pulled out into the alley behind the garage. All of the trash cans were completely filled with trash bags and boxes. The trash cans were in the alley open to public access and were clearly pulled out for the trash service to pick up. During previous surveillance of the garage, Detective Hermes observed the trash cans pulled into the garage.

d.   At about 1:15 p.m., Detective Fricke and Detective Hermes returned to 705 E. Balboa Boulevard, where the open garage was located. Detective Fricke and Detective Hermes then dumped all of the trash from all of

the trash cans into the bed of their truck and transported the bags to Costa Mesa Police Department.

  e.   Detective Fricke and Detective Hermes carefully opened each trash bag and looked through the trash.  There were about 3 large black trash bags containing food, cans, and mail addressed to Unit C.  This was consistent for all of the black bags.  There was one large clear trash bag.  The clear bag contained food, cans, and contained mail addressed to Unit D.  There were two white trash bags as well.  The following is what was found in the two white trash bags along with standard trash:

  (I)   Over a dozen large clear plastic zip loc baggies containing white powdery residue.

  (II)  One large white plastic bag containing over an ounce of similar white powder.

  (III)    One plastic food container containing burnt aluminum foil, a small plastic straw, and a clear plastic baggie.

  (IV)  One crumbled up note that clearly read, "Isaiah Suarez," and the number, "723 8921."

  (V)   One crumbled up note that read, "SLABY," along with some other writing.

  (VI)  One pair of blue latex gloves with similar white powder all over them.

  (VII)    One pair of clear latex gloves with similar white powder all over them.

(VIII)    One paper receipt from the Ferrari Store at 8500 Beverly Blvd. #655, Los Angeles, CA, 90048. The receipt had a date of 02/07/18, at 1538 hours.

f.    Prior to opening the white trash bags, Detective Hermes inspected the bags and noted there were no tears or openings on them.  Both bags were tightly tied shut with the built in draw strings.  Both white bags were opened and inspected separately from each other and separately from any other trash bags.

g.    Based on my training, knowledge, experience, and having discussed this investigation with CMPD Detectives, I believe the burnt foil and straw to be common drug paraphernalia for burning and inhaling illegal drugs. I believe "SLABY" is referring to SUAREZ, whose moniker is "Slabs."  I further believe the contents of the white trash bags were from Unit B at 705 E. Balboa Boulevard, Newport Beach, California 92661.

27.  I was informed by Detective Hermes of the following surveillance that took place on February 23, 2018:

a.    At approximately 2:39 p.m., Detective Hermes noted that PASEK's Ferrari was parked at Bedford Lane via a GPS transmitter.  Due to prior surveillance of PASEK, Detective Hermes suspected PASEK would be driving from Bedford Lane to 705 E. Balboa Boulevard.

b.    At approximately 3:14 p.m., Detective Hermes observed PASEK's Ferrari moving south towards 705 E. Balboa Boulevard via GPS.  At about 3:22 p.m., Detective Sergeant

McKinley observed PASEK arrive in PASEK's Ferrari at 705 E. Balboa Boulevard.

28. I was informed by Detective Hermes of the following surveillance that took place on March 5, 2018:

a.     At approximately about 1:19 p.m., Detective Hermes checked the phone pings for PASEK's phone and observed that the phone pings were plotting on or about Bedford Lane. At approximately 1:50 p.m., Detective Hermes observed PASEK's phone pings were plotting near 705 E. Balboa Boulevard.  At approximately 2:21 p.m., Detective Hermes observed PASEK's phone pings were plotting near the northbound 55 Freeway in Costa Mesa and soon thereafter the phone pings indicated PASEK was back at his residence at 9 MacArthur.

b.     At approximately 3:30 p.m., Detective Hermes and other CMPD detectives established surveillance at 705 E. Balboa Boulevard, Unit B and observed CAO exit the location carrying a white plastic grocery bag in his hand.  Detective Hermes observed CAO walk to the USPS Blue Collection Box located near the 700 block of Balboa Boulevard.  There, Detective Hermes saw CAO remove several small USPS Priority Mail parcels from a white plastic bag and place them in the mail receptacle.  CAO then returned to Unit B at 705 E. Balboa Boulevard.  After CAO left the mailbox, Detective Hermes stayed near the Blue Collection Box and prohibited any further mail pieces to be placed in the receptacle.  Detective Hermes contacted United States

Postal Inspector ("USPI") Jacob Boyd to get access to the
contents of the Blue Collection Box.  Upon opening the mail
receptacle, Detective Hermes observed the seven parcels on
top.  The parcels all were the same size and shape with the
same sender listed on each respective parcel.  Detective
Hermes took the parcels into custody and then subsequently
gave them to USPI Boyd.

c.   Additionally, USPI Boyd found that the
parcels were mailed from a postal facility other than the
zip code of the sender's residence.  I know from USPI Boyd
that drug traffickers will often mail from postal
facilities other than those which are located in their
respective zip code of residence to further disguise
themselves as being associated with the parcel.

d.   Using a public information database, USPI
Boyd could not find anyone with the name listed on the
parcel associated with the address listed for the sender on
the parcels.

e.   Furthermore, the sender used the USPS
"easypost" system to generate labels for the parcels.
"Easypost" is a system that allows individuals to print out
postage for packages from any computer terminal with a
printer, eliminating the need to go into a US Post Office.
USPI Boyd informed me that he learned from the numerous
investigations that he has conducted over the course of the
last few years that drug traffickers are now regularly

using "easypost" in yet another effort to further disguise themselves as being associated with their parcels.

29.   On March 8, 2018, USPI Boyd obtained a warrant to search the contents of the seven parcels.  Detective Hermes informed me of his meeting with USPI Boyd and relayed to me the following information regarding the search of the seven parcels:

   a.   Parcel #1 was being shipped to an individual in Huntsville, AL, and contained a silver zip lock type baggie.  The silver baggie contained a clear plastic zip lock type baggie.  The clear baggie had the number "100" written on the outside with a black marker and appeared to contain approximately that number of small blue circular pills with "A/215" imprinted on them.

   b.   Parcel #2 was being shipped to an individual in Brooklyn, NY, and contained a silver zip lock type baggie.  The silver baggie contained a clear plastic zip lock type baggie.  The clear baggie had the number "250" written on the outside with a black marker and appeared to contain approximately that number of small blue circular pills with "A/215" imprinted on them.

   c.   Parcel #3 was being shipped to an individual in Naperville, IL, and contained a silver zip lock type baggie.  The silver baggie contained a clear plastic zip lock type baggie.  The clear baggie had the number "100" written on the outside with a black marker and appeared to contain approximately that number of small blue circular pills with "A/215" imprinted on them.

d.    Parcel #4 was being shipped to an individual in La Vista, NE, and contained a silver zip lock type baggie.  The silver baggie contained a clear plastic zip lock type baggie.  The clear baggie had the number "100" written on the outside with a black marker and appeared to contain approximately that number of small blue circular pills with "A/215" imprinted on them.[3]

e.    Parcel #5 was being shipped to an individual in Arlington, MA, and contained a silver zip lock type baggie.  The silver baggie contained a clear plastic zip lock type baggie.  The clear baggie had the number "500" written on the outside with a black marker and appeared to contain approximately that number of small blue circular pills with "A/215" imprinted on them.

f.    Parcel #6 was being shipped to an individual in Las Vegas, NV, and contained a silver zip lock type baggie.  The silver baggie contained a clear plastic zip lock type baggie.  The clear baggie had the number "250" written on the outside with a black marker and appeared to contain approximately that number of small blue circular pills with "A/215" imprinted on them.

g.    Box #7 was being shipped to an individual in Dallas, TX, and contained a silver zip lock type baggie. The silver baggie contained a clear plastic zip lock type

---

[3] On March 19, 2018, I learned from USPI Boyd that the parcel being sent to Nebraska was part of a Food and Drug Administration undercover purchase on the dark web.  More information regarding this online undercover operation is described below.

baggie.   The clear baggie contained dozens of small blue circular pills with "A/215" imprinted on them.   The clear baggie also had the number "100" written on the outside with a black marker.

30.   Based on my training, experience, knowledge of this investigation, I believe the blue pills imprinted with "A/215" were counterfeit oxycodone and I believe they were manufactured and pressed at 705 E. Balboa Boulevard, Unit B, Newport Beach, California 92661.

31.   Detective Hermes and USPI Boyd informed me that based on the number written on the outside of each clear baggie, and estimating the quantity of pills in each baggie, that they suspected the number was referring to the number of pills in each baggie.

32.   Detective Hermes also informed that due to the suspicion of fentanyl being used to manufacture these pills, neither USPI Boyd nor Detective Hermes counted, weighed, or tested the pills themselves.   Detective Hermes then transported the parcels containing the pills to the Orange County Sheriff's Department Crime Lab ("OCCL").   The OCCL conducted an official controlled substance test on the pills from all seven parcels and the tests yielded positive results for fentanyl on the pills from each parcel.

33.   I was informed by Detective Hermes of the following surveillance that took place on March 15, 2018:

a.    At approximately 1:30 p.m., Detective Hermes was conducting surveillance at 705 E. Balboa Boulevard, Unit B, Newport Beach, California 92661.

b.    At approximately 1:35 p.m., Detective Hermes observed CAO enter 705 E. Balboa Boulevard, Unit B, Newport Beach, California 92661 using keys to unlock the door.  He closed the door and Detective Hermes did not observe any more activity for about two hours.

c.    At approximately 6:00 p.m., Detective Hermes re-established surveillance at 705 E. Balboa Boulevard, Unit B, Newport Beach, California 92661.

d.    At approximately 6:30 p.m., Detective Hermes observed two unknown males exit Unit B and walk down to the Great Mex restaurant on Balboa Boulevard.

e.    At about 7:00 p.m., CAO exited Unit B and walked down to the Great Mex restaurant.  After about ten minutes had passed, CAO and the two unknown males exited Great Mex and walked back up to 705 E. Balboa Boulevard, Unit B, Newport Beach, California 92661.  CAO used keys to unlock the door and all three of the males entered the unit.

f.    At approximately 10:00 p.m., CAO exited 705 E. Balboa Boulevard, Unit B, Newport Beach, California 92661 and walked towards CAO's Mercedes-Benz, which was parked in the beach parking lot to the rear of the location.  Detective Hermes maintained observation of CAO and could see he was carrying two small white boxes.  The

23

boxes looked similar to the Priority Mail parcels containing counterfeit pills he observed CAO place in the USPS collection box on March 5, 2018.  CAO entered his vehicle with the boxes and drove northbound on Balboa Boulevard.  Detective Hermes and CMPD detectives followed CAO until CAO arrived at an apartment complex in the city of Orange -- later determined to be where CAO lived.

34.  On March 21, 2018, Detective Hermes informed me that CMPD detectives successfully placed a GPS tracker on CAO's Mercedes-Benz. Having reviewed GPS information, I am aware of CAO's Mercedes-Benz being at the following locations between March 21, 2018, and March 27, 2018:[4]

a.  CAO's residence on 16 occasions;

b.  SUAREZ's residence at 705 E. Balboa Boulevard, Newport Beach, California on 13 occasions;

c.  1817 Bedford Lane, Newport Beach, California on 2 occasions;

d.  PASEK's residence at 9 MacArthur on 2 occasions.

35.  On March 28, 2018, I reviewed the GPS tracker information on PASEK's 4Runner for the time period of March 2, 2018, through March 28, 2018, and I determined PASEK's 4Runner has been at 705 E. Balboa Boulevard on at least one occasion, at 1817 Bedford Lane on approximately nine occasions, and at CAO's

---

[4] The locations and frequencies listed are approximate locations and do not purport to list the exact locations or the total number of locations visited by CAO's Mercedes-Benz during the time frame listed.

24

residence in Orange on approximately ten occasions.  Moreover, on March 21, 2018, PASEK's 4Runner traveled from CAO's residence to Bedford Lane and then to 705 E. Balboa Boulevard.

36.  On April 3, 2018, CMPD Detective Fricke informed me of the following:

a.    On April 2, 2018, at approximately 10:55 a.m., Detective Hermes was monitoring CAO's vehicle via a GPS tracker.  Detective Hermes saw that CAO's vehicle was stopped outside of PASEK's residence at 9 MacArthur. Detective Hermes observed via GPS tracker CAO's vehicle arrive at 705 E. Balboa Boulevard at approximately 12:49 p.m., and arrive at 3101 W. Sunflower Avenue, Santa Ana, California, the location of a United States Post Office, at approximately 1:15 p.m.  Based on the fact Detective Fricke had seen CAO place Priority Mail boxes containing counterfeit Oxycodone pills in a United States Post Office receptacle in the past, both Detective Fricke and Detective Hermes suspected CAO was doing the same again. Furthermore, the GPS tracker indicated CAO visited PASEK's residence and the suspected pill pressing location prior to arriving at the post office.  Detective Hermes relayed the above information to Detective Sergeant McKinley who responded to the Post Office.

b.    At approximately 3:00 p.m., Detective Hermes arrived at the Post Office and met with Detective Sergeant McKinley.  With the assistance of a Post Office manager, Detective Hermes opened the blue and silver mail receptacle

near the front lobby and saw there were 13 Priority Mail
boxes inside.  All 13 boxes were exactly the same size and
shape as the boxes Detective Hermes seized on March 5,
2018, which a subsequent search determined the boxes to
contain counterfeit pills containing fentanyl inside.
Detective Hermes looked at the labels on the boxes and saw
they all had the "Easypost" shipping service labels on them
-- the same service used on the boxes Detective Hermes
seized on March 5, 2018.

       c.  Seven of the boxes had the return name and
address of a purported individual on Portland Avenue in
Huntington Beach and six of the boxes had the return name
and address of a purported individual on Rumford Lane in
Huntington Beach.  Detective Hermes conducted records
checks of both names and addresses using various police
databases and was unable to identify either of the names on
the boxes.  It appeared the return address names were
fictitious, just as they were on the previous mail seizures
that contained fentanyl.

       d.  Detective Hermes picked up each box using
latex gloves and placed them into a paper evidence bag.
Due to all of the above facts, coupled with the fact CAO
drove from 705 E. Balboa Boulevard in Newport Beach to the
post office in Santa Ana, Detective Hermes believed CAO
likely dropped the Priority Mail boxes into the receptacle,
and that they likely contained counterfeit Oxycodone pills
containing fentanyl.  These thirteen boxes are currently

secured as evidence pending the issuance of a search
warrant currently being sought from the Court.

37. On April 3, 2018, Detective Fricke informed me that
drove back to the post office on Sunflower to obtain video
surveillance from the approximate date and time when the GPS
tracker indicated CAO's vehicle was at the post office.
Detective Fricke told me he observed the following during his
review of from the surveillance video:

     a. On April 2, 2018, at approximately 1:13
p.m., Detective Fricke saw a white Mercedes arrive and
park; the Mercedes matched the appearance of CAO's vehicle.
Detective Fricke observed who he recognized to be CAO exit
the driver's seat and walk into the post office.

     b. Detective Fricke observed CAO carry two
large, white plastic bags containing boxes into the lobby
area and CAO emptied the boxes into the same mail
receptacle from which Detective Hermes had recovered the
boxes. As CAO emptied the boxes out of the bag, they came
into view briefly. The boxes appeared to be the same size
priority mail boxes seized by Detective Hermes. After
depositing the boxes, CAO left the post office, entered his
vehicle, and drove away at approximately 1:16 p.m.

38. On April 3, 2018, Detective Hermes informed me of the
following surveillance enforcement activity that took place that
day:

     a. At approximately 10:30 a.m., Detective
Hermes was conducting surveillance at Unit B of 705 E.

Balboa Boulevard with other SIU detectives and was
monitoring PASEK's phone and CAO's vehicle via GPS
transmitter.  At approximately 1:46 p.m., Detective Hermes
observed what appeared to be PASEK and CAO enter Unit B of
705 E. Balboa Boulevard, Unit B.  Detective Hermes looked
at CAO's vehicle location via GPS and saw it had arrived at
that location.  Detective Fricke drove in the alley behind
the location and physically observed CAO's vehicle parked
in the open garage port.  The location data for PASEK's
cellular phone also showed in the area of 705 E. Balboa
Boulevard.

           b.    Detective Sergeant McKinley kept constant
observation of Unit B.  After about ten minutes, Detective
Sergeant McKinley stated over the police radio that PASEK
and CAO were exiting Unit B and walking towards the open
garage where CAO's vehicle was parked.

           c.    Detective Fricke observed CAO and PASEK in
CAO's Mercedes-Benz about to turn northbound on Balboa
Boulevard.  Soon thereafter, other CMPD officers conducted
a traffic stop on CAO's Mercedes-Benz.

     39.  Several minutes later, I arrived at the traffic stop
and searched CAO's Mercedes-Benz pursuant to the previously
issued warrant on March 29, 2018.  Officers other arrested
PASEK, CAO, and SAUREZ at this time and bundles of US Currency
(in 100s and 20s) were found on the persons of CAO and SAUREZ.

     40.  At that time, I instructed the other agents and
detectives at the other three locations to search the premises

and the vehicles in accordance with the search warrants obtained on March 29, 2018. Below is a list of what was seized at the following locations:

      a.   9 MacArthur Place, Unit 2502, Santa Ana, California 92707 (Wyatt PASEK's residence):

      i.   Plastic baggies containing approximately 13,000 round, blue pills stamped with "A/215";

      ii.   Unknown white powder contained in a clear plastic baggie;

      iii.  9 millimeter ammunition;

      iv.   Bundles of US Currency throughout the apartment in 20s and 100s.

      b.   705 E. Balboa Boulevard, Unit B, Newport Beach, California 92661 (Isaiah SUAREZ's residence):

      i.   Plastic baggies containing approximately 1 kg of round, blue pills stamped with "A/215";

      ii.   Plastic baggies containing approximately 1.75 kg white, oblong pills stamped with "GG249" (I know from my training and experience that the GG249 are likely counterfeit Xanax pills);

      iii. Bowls containing an unknown white and blue powder

      iv.   Large plastic bags containing approximately 4.5 kg of unknown white and blue powders;

      v.   3 small scales;

vi.   1 pill press;

vii. Mylar bags. The Mylar bags appeared to be the same Mylar bags that contained the baggies that were found in the seized parcels from CAO's Mercedes-Benz.

viii.     I was also informed that SUAREZ's residence was a 1 bedroom, 1 bath apartment that was approximately 900 square feet. Much of the pill press lab was in the bedroom and almost the entire kitchen contained items for the pill press and did not have typical kitchen items in it.

c.   3099 W. Chapman Avenue, Unit 402, Orange, California 92868 (CAO's residence):

i.   2 priority mail parcels containing approximately 200 round, blue pills stamped with "A/215"

ii.  Mylar bags

iii. Small, digital scale

d.    CAO's 2013 white Mercedes-Benz, white in color, bearing California license plate 7ALL647:

i.   6 priority mail parcels containing approximately 750 round, blue pills stamped with "A/215" (total for the six parcels).

ii.  A/215 pill dies

e.    PASEK's mother's residence on Bedford Lane:

i.   Bundles of US Currency throughout the apartment in 20s and 100s.

41. Based on my training, experience, knowledge of this investigation, having spoken with other investigators on this

investigation, and having executed the search warrants today, I
believe PASEK, CAO, SUAREZ, and others still unknown were
operating a clandestine counterfeit pharmaceutical operation.   I
believe PASEK, CAO, SUAREZ, and others were pressing the
counterfeit pharmaceutical pills containing fentanyl and its
analogues at 705 E. Balboa Boulevard, Unit B, Newport Beach,
California 92661 and selling the pills to their clientele both
locally and off of the dark web. Having spoken with other
investigators involved in this investigation, I believe PASEK,
CAO, SUAREZ, and other unknown were selling counterfeit
oxycodone pills (the round, blue pills stamped with "A/215") and
counterfeit Xanax pills (the white, oblong pills stamped
"GG249").

42.   On March 19, 2018, Internal Revenue Service SA Michael
Kim informed me of the following:

a.   Recorded conversations between CS-1 and one
of PASEK's associates discuss how PASEK does not like to
meet people with whom he conducts drug or money laundering
transactions.   PASEK's associate indicated that PASEK only
sells narcotics through the internet and ships his products
through the mail.   Based on my training and experience and
discussions with other agents, it is my understanding that
this type of activity is largely hosted through darknet
marketplaces where the primary currency of doing business
is bitcoin.

b.   Other sources of information corroborate
PASEK's dealings with bitcoin.   SA Kim reviewed records for

31

a Wells Fargo bank account in PASEK's name ending in 3205, which shows PASEK as the sole signatory on the account. The account activity reveals that PASEK does reoccurring transactions with CoinBase, a well-known bitcoin exchanger. Although PASEK's transactions with CoinBase is limited to lower dollar amounts, it indicates PASEK's relative familiarity and usage with the digital currency.  SA Kim informed me that it is also common for darknet market users to employ more cautious and covert methods of exchanging their bitcoin from illicit activities to fiat currency other than CoinBase.

c.   SA Kim also viewed pictures and videos tied to PASEK's social media accounts that promote the use of bitcoin, and PASEK also posted media showing the purchase of a bitcoin pendant that appears to be made of diamonds and precious metals.

43.   On March 21, 2018, I reviewed PASEK's Instagram and Youtube postings and observed the following:

a.   PASEK has numerous pictures and videos showing PASEK with bulk US currency, with exotic vehicles, and/or what appears to be expensive jewelry.  In addition, some of the pictures and videos PASEK posted appear to be from inside PASEK's residence at 9 MacArthur.

b.   Based on my training, experience, and knowledge of this investigation I believe that the bulk currency and jewelry in the postings are likely derived

from drug proceeds.   I know that it is common for narcotics
traffickers to flaunt wealth.

44.   On March 27, 2018, Food and Drug Administration Office
of Criminal Investigations ("FDA-OCI") SA Paul Cox informed me
of the following:

a.   The darknet is an encrypted portion of the
internet which is not indexed and is not accessible through
typical internet browsing software.   A darknet Marketplace
is a commercial website, operating on the darknet, bringing
vendors and purchasers together and facilitating the
settlement of transactions, almost exclusively in
cryptocurrencies.   Cryptocurrencies are digital currencies
which utilize encryption to regulate the generation of
currency and verify the transfer of funds.   Dream Market is
a darknet marketplace which hosts numerous vendors, selling
items including drugs, stolen data, and counterfeit
consumer goods.   EasyPost is a reseller of USPS postage
which offers customers to purchase postage through the use
of a software Application Programming Interface ("API").
An API is a set of definitions, protocols, and tools which
allow computer software, or software components, to
communicate.

b.   On January 05, 2018, acting in an undercover
capacity on the Dream Market, agents from FDA-OCI purchased
of one hundred (100) pills of "PRESSED OXY" purported to be
pressed with .8mg of fentanyl from a vendor utilizing the
moniker "oxygod" on the marketplace.   The product was

33

purchased in exchange for $530 USD of cryptocurrency.  A review of photos associated with this product show multiple round pills, blue in color, appearing to bear the pill inscription "A 215."

   c.   On January 12, 2018, agents from FDA-OCI, received approximately one hundred and seven (107) round pills, blue in color, bearing the inscription "A 215", found within a parcel bearing a United States Postal Service (USPS) label, the words "EasyPost", and a USPS Tracking number "9405536897846164799437."

   d.   On January 24, 2018, acting in an undercover capacity on the Dream Market, agents from FDA-OCI purchased another one hundred (100) pills of "PRESSED OXY" purported to be pressed with .8mg of fentanyl from a vendor utilizing the moniker "oxygod" on the marketplace.  The product was purchased in exchange for $530 USD of cryptocurrency.  A review of photos associated with this product show multiple round pills, blue in color, appearing to bear the pill inscription "A 215."

   e.   On January 30, 2018, agents from FDA-OCI received a parcel shipped to the District of Nebraska, containing approximately one hundred and forty-four (144) round pills, blue in color, bearing the inscription "A 215", found within a parcel bearing a United States Postal Service (USPS) label, the words "EasyPost", and a USPS Tracking number "9405536897846180463787."

f.   On February 1, 2018 and February 8, 2018, agents from FDA-OCI received information from EasyPost indicating that the label bearing tracking numbers 9405536897846164799437 and 9405536897846180463787 were purchased by an EasyPost customer associated with the website bitcoinpostage.info, which sells postage in exchange for Bitcoin.

g.   On March 02, 2018, acting in an undercover capacity on the Dream Market, agents from FDA-OCI purchased another one hundred (100) pills of "PRESSED OXY" purported to be pressed with .8mg of fentanyl from a vendor utilizing the moniker "oxygod" on the marketplace.  The product was purchased in exchange for $530 USD of cryptocurrency.  A review of photos associated with this product show multiple round pills, blue in color, appearing to bear the pill inscription "A 215."

h.   I know as part of this investigation that the March 2, 2018, purchase was one of the parcels intercepted by CMPD detectives and USPI Boyd on March 5, 2018, and searched on March 8, 2018, pursuant to a search warrant.  The parcel contained approximately 100 small blue circular pills with "A/215" imprinted on them and later determined to test positive for fentanyl.

45.  On March 27, 2018, SA Kim informed me of the following:

a.   Based on a review of the evidence in this investigation, we believe that PASEK, CAO, SAUREZ, and

35

other known and unknown co-conspirators sold narcotics on the darknet marketplace known as Dream Market under the alias "oxygod." Dream Market operates much like eBay where customers leave reviews about the vendor and product and assess a rating. On Dream Market, in addition to a review and rating, there is also an indicator for the amount of the transaction. From approximately December 11, 2017 through March 20, 2018, customers left approximately 203 reviews and ratings for "oxygod." The 203 reviews and ratings amounted to a total transaction amount of approximately 15.089 bitcoin. Using historical bitcoin valuations made available through the exchange service, Bitstamp.net, the 15.089 bitcoin is estimated to be $189,599.68 in total sales. Due to the volatile nature in bitcoin pricing, this figure is an estimate of income earned on the day that each transaction took place and does not account for gains or losses on the exchange of the digital asset or currency. The total sales in bitcoin also do not take into account possible sales where the customer left no review or rating.

b.   PASEK maintained at least one bank account at Wells Fargo Bank. The individual bank account ending in 3205 was opened in or around October 10, 2015. PASEK is the sole signatory on the account as identified through the signature card. Records obtained from Wells Fargo show that from May 1, 2016 through January 31, 2018, there was a total of approximately $123,768.54 in total deposits and

additions into the bank account ending in 3205.  During the same time period, approximately $108,870.66 of the deposits were cash deposits made into the bank account.  The bank account also does not show many of the expected expenditures for vehicles, jewelry, or clothing as evidenced in PASEK's social media accounts.

## V.  CONCLUSION

46.  For all the reasons described above, I respectfully submit that there is probable cause to believe that PASEK, CAO, and SUAREZ have committed a violation of Title 21, United States Code, Section 846, Conspiracy to Distribute Controlled Substances – fentanyl.

/s/

Lindsey Bellomy
SPECIAL AGENT

Subscribed to and sworn before me
this __4__ day of April, 2018.

KAREN E. SCOTT

THE HONORABLE KAREN E. SCOTT
UNITED STATES MAGISTRATE JUDGE